IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| MICHELE WILSON | ) | CASE NO. |
| 46 Gertrude Avenue, Apt 3. | ) | |
| Boardman, Ohio, 44512 | ) | JUDGE: |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **COMPLAINT FOR DAMAGES** |
| | ) | |
| MERCY HEALTH YOUNGSTOWN, LLC | ) | **(Jury Demand Endorsed Hereon)** |
| c/o Joseph Shoaff, Statutory Agent | ) | |
| 1044 Belmont Avenue | ) | |
| Youngstown, Ohio, 44501 | ) | |
| | ) | |
| **Please serve also:** | ) | |
| Thomas J. Wiencek | ) | |
| VP/Associate General Counsel | ) | |
| Bon Secours Mercy Health | ) | |
| 388 S. Main St. | ) | |
| Suite 500 | ) | |
| Akron, Ohio, 44311 | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Michele Wilson, by and through undersigned counsel, as her Complaint against

Defendant, states and avers the following:

## NATURE OF THE CLAIMS.

1. This is an action for declaratory, injunctive and equitable relief, as well as for monetary

damages, to redress Defendant Mercy Health Youngstown, LLC's ("Mercy") unlawful

employment actions against Wilson, to include its discriminatory termination of Wilson due

to her race, African American, in violation of Section 1981 of the Civil Rights Act of 1866,

42 U.S.C. § 1981 ("Section 1981") and Ohio Revised Code § 4112.02(A)

## PARTIES.

2. Wilson is a resident of the city of Boardman, county of Mahoning, state of Ohio.

3.   Mercy is a domestic limited liability corporation with a principal place of business located in the city of Youngstown, county of Mahoning, state of Ohio.

**JURISDICTION AND VENUE.**

4.   Mercy is an Ohio limited liability company and/or citizen; hires citizens of the state of Ohio; contracts with companies in Ohio; and owns or rent properties in Ohio. As such, the exercise of personal jurisdiction over Mercy comports with due process.

5.   This Court is vested with subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as this action involves federal questions regarding the deprivation of Wilson's rights Section 1981.

6.   This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Wilson's state law claim for Race Discrimination under Ohio Revised Code § 4112.02(A) because that claim derives from a common nucleus of operative facts as Wilson's claim under Section 1981.

7.   Venue is proper in this district pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to this action, including the unlawful employment practices alleged herein, occurred in this district.

**STATEMENT OF FACTS.**

8.   Wilson is African American.

9.   Wilson is a former employee of Mercy, where she worked as Patient Access Specialist and/or in registration.

10.   Wilson was first hired by Defendant in or around October of 2014.

11.   Wilson suffers from several disabilities and/or physical impairments, to include heart failure, asthma, diabetes, Graves disease, and complications stemming from the removal of her thyroid ("Disabilities").

12. As a result of her Disabilities, Wilson takes several medications that can sometimes make her tired, "foggy," forgetful, and distractable.

13. Despite the intermittent effects of her medication, Wilson was able to perform the essential functions of her job.

14. On or about January 16, 2019, Wilson travelled to the Giant Eagle grocery store located 476 Boardman Canfield Road after she finished working for the day to buy groceries ("Canfield Road Giant Eagle").

15. Unbeknownst to Wilson at the time, another Mercy employee, Maria Frank, was also shopping at the Canfield Road Giant Eagle when Wilson was shopping.

16. Frank is Caucasian.

17. As Frank was shopping, she received a phone call from her husband.

18. Frank walked out of the Canfield Road Giant Eagle to take her husband's phone call.

19. When Frank walked out of the Canfield Road Giant Eagle, she left her wallet in her shopping cart.

20. Shortly after Frank left the Canfield Road Giant Eagle, Wilson walked past Frank's abandoned shopping cart found and saw Frank's wallet sitting in it.

21. Wilson did not know the wallet she had found belonged to Frank.

22. Wilson did not open Frank's wallet to learn who it belonged to.

23. Wilson immediately took Frank's wallet to the customer service counter to report that she had found it.

24. There was a line when Wilson approached the customer service counter.

25. Wilson waited for a period of time in the line at the customer service counter before deciding that she would just mail the wallet to its owner at a later time.

26. Wilson did not want to continue to wait in line at the customer service counter; she had to use the restroom and wanted to get her shopping done so she could get home to do so.

27. Wilson was tired and mentally exhausted after working all day at Mercy and just wanted to get her shopping done so she could go home.

28. Wilson then placed Frank's wallet in the child seat area of Wilson's shopping cart and placed her large purse on top of it while she finished her shopping.

29. After Wilson paid for her groceries, she absent-mindedly placed the wallet she had found into her purse.

30. As Wilson left the Canfield Road Giant Eagle, Frank approached her.

31. Wilson's mind was wandering when Frank approached her.

32. Wilson was startled when Frank approached her.

33. Wilson recognized Frank from Mercy.

34. Frank told Wilson that someone had stolen her wallet.

35. Frank did not describe her wallet to Wilson.

36. Frank did not say that she had left her wallet in a shopping cart; just that it was "stolen."

37. Due to Wilson's state of mind, Frank's remark that someone had stolen her wallet did not trigger Wilson to think about the wallet she had found.

38. Wilson though Frank was describing someone mugging or robbing her.

39. Because Frank was walking into the Canfield Road Giant Eagle, Wilson did not realize that Frank had already been inside the store, or that Frank was saying that her wallet had been "stolen" inside the store.

40. Wilson responded to Frank by telling her she was sorry to hear about Frank's situation.

41. Wilson then left the Canfield Road Giant Eagle and went home.

42.   Shortly thereafter, Frank called the Boardman Police.

43.   The Boardman Police met with Frank while Frank was still at the Canfield Road Giant Eagle.

44.   Frank told police that she suspected that a "black female in her 30's with dreadlock style hair and wearing a blue coat and stocking cap" that she had seen "eating chicken near the front of the store" may have stolen her wallet.

45.   Frank was not describing Wilson, but another African American customer of the Canfield Road Giant Eagle ("African American Customer").

46.   Other people were near the front of the Canfield Road Giant Eagle at the time Frank walked out, including Caucasians.

47.   Frank only suspected the "black female in her 30's with dreadlock style hair" of stealing her wallet because of that person's race, African American.

48.   Frank did not accuse any non-African Americans of stealing her wallet.

49.   Upon information or belief, Frank believes and/or subscribes to the stereotype that African Americans are prone to stealing.

50.   Frank singled out the African American Customer as suspect because the African American Customer was African American.

51.   Subsequently, the Boardman Police conducted an investigation and gathered video footage from the Canfield Road Giant Eagle ("Investigation").

52.   Detective Benjamin Switka performed the Investigation.

53.   Switka kept detailed notes of his investigation and created audio recordings of his interviews with Frank and Wilson.

54.   A true and accurate copy of Switka's investigation notes, identified as a "narrative supplement" report, are attached hereto as Exhibit "A."

55. The Boardman Police eventually identified Wilson as having found Frank's wallet after reviewing video footage and pulling information from Wilson's "Giant Eagle Card," which Wilson had used when purchasing her groceries.

56. Wilson did not work on January 17, 2019.

57. Wilson reported to work as usual on January 18, 2019.

58. Wilson still had Frank's wallet in her purse when she reported to work.

59. Wilson had not removed Frank's wallet from her purse since she had returned home on September 16, 2019.

60. While Wilson was at work, she saw Frank.

61. When Wilson saw Frank, Frank was talking about her wallet being "stolen" at the Canfield Giant Eagle.

62. Frank specifically mentioned that her wallet was a "Coach" brand wallet.

63. When Wilson heard Frank talking describing a "Coach" brand wallet that was "stolen", she was immediately reminded of encountering Frank at the Canfield Road Giant Eagle and of Frank's telling her about the "stolen" wallet.

64. Upon seeing Frank and hearing her specifically describe her wallet, Wilson put "two and two together" and determined that the wallet she had found may belong to Frank.

65. Wilson then returned to her purse, pulled out the wallet, and confirmed it was Frank's.

66. Wilson then sought out Frank and returned the Wallet to her.

67. Frank's wallet was fully intact when Wilson returned it to her; Frank would later confirm to the Boardman Police that nothing was missing.

68. Frank refused to believe that an African American could have merely found her wallet; she was convinced that Wilson had "stolen" her wallet.

6

69. Frank only believed that Wilson had stolen rather than found her wallet because Wilson is African American.

70. Later in the day on January 18, 2019, Frank called Switka to report that Wilson had returned her wallet to her.

71. Frank told Switka that Wilson had "stolen" her wallet.

72. Frank then asked Switka about "filing charges" because Frank "knows it's a felony."

73. As stated in Switka's narrative supplement report, "I told (Frank) that I don't know about filing charges because of the fact that she (Frank) left her wallet in her buggy unattended and the video shows Michele (Wilson) finding the wallet and then taking it to customer service in her hand and standing there for a minute, but they are busy so she placed it back in the buggy and continued shopping."

74. Frank told Switka that she did not know why Wilson did not return the wallet when she ran into her at the Canfield Giant Eagle.

75. As stated in Switka's narrative supplement report, Switka responded to Frank by telling her "the video does not show her (Wilson) opening the wallet at any time to see who it belongs to, so she may have forgotten about it."

76. Frank was unwilling to accept the mitigating factors described to her by Switka; she was instead convinced that Wilson had stolen her wallet because Wilson is African American.

77. Undeterred, Frank then reported to Mercy that Wilson had "stolen" her wallet.

78. On January 23, 2019, Mercy suspended Wilson without pay based solely on Frank's uncorroborated and racially motivated allegations.

79. Mercy had failed to investigate whether there was any basis to Frank's allegations against Wilson before suspending Wilson.

80. When Wilson was told that she was being suspended for allegedly stealing Frank's wallet, Wilson complained that she had not stolen Frank's wallet but had merely found it and then returned it.

81. Based on racial animus, Mercy rejected Wilson's explanation of the circumstances that resulted in her coming to possess Frank's wallet.

82. Mercy's suspension of Wilson was an adverse action.

83. Mercy's suspension of Wilson was an adverse employment action.

84. Mercy took Frank's allegations as true because Wilson is African American.

85. At 1:38pm on January 23, 2019, Frank called Switka to notify him of Wilson's suspension.

86. At 2:09pm on January 23, 2019, Mercy's Assistant Chief of Police, Steve Fertig, called Switka to discuss Frank's allegations against Wilson.

87. Mercy's first call with police to discuss Wilson only occurred after Wilson had already been suspended.

88. Fertig told Switka that Frank had reported that Wilson stole her wallet at the Canfield Giant Eagle and asked if charges would be filed against Wilson.

89. As stated in Switka's narrative supplement report, he told Fertig "based on what I have I [do] not feel there was enough probable cause to file charges based on the circumstances."

90. Switka further elaborated to Fertig: "Frank left her wallet in a buggy and left the store and…Wilson came in and found the wallet and immediately walked up to the customer service counter with it in her hand and stood there for a minute, but they were busy so she put it back in the buggy and continued to shop and then left the store after placing it in her purse. But then returned it on January 18, 2019 intact."

91. According to Switka's narrative supplement report, Fertig then said "[Frank] said how this is a felony and she (Wilson) is going to jail."

92. Before hanging up with Fertig, Switka asked Fertig if Wilson had been suspended.

93. According to Switka's narrative supplement report, Fertig confirmed the suspension and stated that the purpose of his call was that Mercy "just want(s) to see the outcome of our case."

94. Despite being informed by police that it appeared that Wilson had merely found Frank's wallet, rather than stolen it, Mercy did not end Wilson's suspension or allow Wilson to return to work.

95. On January 24, 2019, Switka spoke with Prosecutor Michael McBride about Frank's allegations.

96. McBride declined to prosecute Wilson, stating that he "would not be able to prove any type of criminal intent" and noting that the wallet was returned intact.

97. On January 25, 2019, Switka called Frank and told her that McBride had declined to prosecute, and that he was closing the case.

98. Minutes later, Switka called Fertig and notified him that McBride had declined to prosecute due to the lack of criminal intent, and that he was closing the case.

99. Switka then asked Fertig to "let [Wilson's] manager know supervisor know this because she…had been suspended and he (Fertig) confirmed that she was suspended. [Fertig] said that he would let them know that we would not be pursuing criminal charges.

100. On January 29, 2019, Mercy terminated Wilson.

101. As justification for terminating Wilson, Mercy claimed that Wilson had "stolen" Frank's wallet.

102. Mercy's stated reason for terminating Wilson had no basis in fact.

103. Mercy's stated reason for terminating Wilson is a pretext for discrimination based on Wilson's race, African American.

104. Alternatively, Mercy's decision to terminate Wilson was based on a racist stereotype that African Americans steal.

105. Mercy knew that police had declined to charge Wilson with any crime because there was no evidence of intent to steal; to the contrary, the evidence showed that Wilson intended to return the wallet; forgot about it for a short period of time; and had returned it intact as soon as she realized who the wallet belonged to.

106. Based on the facts and circumstances known to Mercy and which were provided to Mercy by Switka, Mercy did not and could not have a reasonable belief that Wilson had committed any theft.

107. Subsequent to Wilson's termination, she engaged counsel, who sent Mercy a letter outlining Wilson's potential claims for disability discrimination and alleged Family Medical Leave Act ("FMLA") violations ("Notice of Claims"). [1]

108. Wilson's Notice of Claims was sent to Mercy on or about June 10, 2019.

109. On July 12, 2019, Mercy responded to Wilson's Notice of Claims ("Response Letter").

110. A true and accurate copy of Mercy's Response Letter is attached hereto as Exhibit "B."

111. In Mercy's Response Letter, Mercy threatened to seek sanctions against Wilson and her then-counsel if Wilson pursued her claims under the FMLA or for disability discrimination.

112. In Mercy's Response letter, Mercy made several demonstrably false statements regarding Wilson, calling her a "petty thief":

---

[1] Wilson has declined to bring these claims as part of this action.

    a. First, Mercy stated in the Response Letter that Wilson had "stolen" Frank's wallet, despite being aware that police had concluded that Wilson had not stolen the wallet.

    b. Next, Mercy claimed that "[Frank] received a phone call from…the police department, who informed her that Ms. Wilson had stolen the wallet. This conclusion was reached based on a security video showing Ms. Wilson stealing [Frank's] wallet while inside the store. The police were able to confirm Ms. Wilson was the thief in the video based on her use of a Giant Eagle Card…" This is again contrary to what Frank and Mercy were both told – that Wilson had only found the wallet, and that there was no evidence of a criminal intent to "steal."

    c. In its Response Letter, Mercy further stated that "once she (Wilson) was aware the security video implicated her in the theft she finally admitted she was the thief and returned the wallet." This is another falsehood. While Wilson did return the wallet, she had never lied about having prior to then and she had never admitted to being "the thief." Indeed, Wilson expressly denied "stealing" the wallet when Mercy suspended her and had told Mercy that she had only found it and returned it.

    d. Finally, Mercy claimed in its Response Letter that it was only because Frank had declined to press charges, and not because of the lack of evidence of theft, that Wilson was not prosecuted: "because the wallet was returned, [Frank] declined to press charges, and so the police did not pursue the matter." In reality, Frank had pushed for Wilson to be charged with a felony and told her supervisors at Mercy that Wilson was going to "go to jail." However, police did not pursue the matter because there was no evidence Wilson had stolen anything. This is a fact Mercy was expressly advised of by police.

113. The false statements contained in Mercy's Response Letter demonstrate that Mercy either (1) failed to investigate Frank's theft allegations against Wilson before terminating Wilson based on racial stereotypes about African Americans or (2) was aware of the outcome of the police investigation into Frank's allegations but rejected that outcome because it did not conform with Mercy's racist beliefs about African Americans.

114. Alternatively, Mercy took adverse action against Wilson based on nothing more than the racial animus and beliefs of a white employee who could not accept that Wilson, an African American, could be innocent in having found her wallet, rather than stealing it.

115. As a result of Defendants' unlawful conduct, Wilson has suffered and continues to suffer damages.

## COUNT I: RACE DISCRIMINATION IN VIOLATION OF 42 U.S.C. § 1981.

116. Wilson re-alleges and incorporates by reference the allegations set forth in paragraphs 1-112, above.

117. Mercy's discrimination against Wilson violated the rights afforded to Wilson under the Civil Rights Act of 1866, 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991.

118. By the conduct described above, Mercy intentionally deprived Wilson of the same rights as are enjoyed by Caucasian citizens to the creation, performance, enjoyment, and all benefits and privileges, of her employment relationship with Mercy, in violation of Section 1981.

119. As a result of Mercy's discrimination against Wilson in violation of Section 1981, Wilson has been denied employment opportunities providing substantial compensation and benefits, thereby entitling Wilson to injunctive, equitable, and compensatory monetary relief.

120. As a result of Mercy's discrimination against Wilson in violation of Section 1981, Wilson has suffered mental anguish and emotional distress, including, but not limited to, depression, humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

121. In its discriminatory actions as alleged above, Mercy has acted with malice or reckless indifference to the rights of Wilson, thereby entitling Wilson to an award of punitive damages.

122. To remedy the violations of the rights of Wilson secured by Section 1981, Wilson requests that the Court award her the relief prayed for below.

## COUNT II:  UNLAWFUL RACE DISCRIMINATION IN VIOLATION OF O.R.C. § 4112.02.

123. Wilson re-alleges and incorporates by reference the allegations set forth in paragraphs 1-119, above.

124. Wilson is a member of a statutorily protected class based on her race under R.C. § 4112.02(A).

125. Mercy discriminated against Wilson on the basis of her race when it accepted as true that Wilson, an African American, had stolen a Caucasian employee's wallet despite information it was aware and was specifically advised of by police of that demonstrated that Wilson had merely found and then returned Frank's wallet.

126. Mercy discriminated against Wilson on the basis of her race when it suspended her based on nothing more than Frank's unsubstantiated and racially tinged accusations of theft against Wilson.

127. Mercy discriminated against Wilson on the basis of her race when it terminated Wilson for "theft" despite being aware of overwhelming evidence that no such theft occurred.

128. Mercy discriminated against Wilson on the basis of her race when it determined that Wilson had criminal intent in possessing Frank's wallet despite being told by police that no such criminal intent could be shown.

129. Mercy was not in possession of evidence regarding Wilson's actions that police were not aware of; instead, Mercy determined that Wilson had criminal intent merely because Wilson is African American.

130. Mercy's discriminatory conduct towards Wilson violated O.R.C. § 4112.02.

131. As a result of Mercy's discrimination against Wilson in violation of O.R.C. § 4112.02, Wilson has been denied employment opportunities providing substantial compensation and benefits, thereby entitling Wilson to injunctive, equitable, and compensatory monetary relief.

132. As a result of Mercy's discrimination against Wilson in violation of O.R.C. § 4112.02, Wilson has suffered mental anguish and emotional distress, including, but not limited to, depression,

13

humiliation, embarrassment, stress and anxiety, loss of self-esteem and self-confidence, and emotional pain and suffering.

133. In its discriminatory actions as alleged above, Mercy has acted with malice or reckless indifference to the rights of Wilson, thereby entitling Wilson to an award of punitive damages.

134. To remedy the violations of the rights of Wilson secured by O.R.C. § 4112.02, Wilson requests that the Court award her the relief prayed for below.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Michele Wilson requests judgment in her favor against Defendant, containing the following relief:

(a) A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the laws of the United States;

(b) An injunction and order permanently restraining Defendant from engaging in such unlawful conduct;

(c) An order directing Defendant to place Wilson in the position she would have occupied but for Defendants' discriminatory treatment of her, as well as to take such affirmative action as is necessary to ensure that the effects of these unlawful employment practices and other unlawful conduct are eliminated and do not continue to affect Wilson;

(d) An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Wilson for all monetary and/or economic damages, including, but not limited to, the loss of past and future income, wages, compensation, job security and other benefits of employment;

(e) An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Wilson for all non-monetary and/or compensatory damages, including, but not limited to, compensation for her mental anguish and emotional distress, humiliation, depression, embarrassment, stress and anxiety, loss of self-esteem, self-confidence and personal dignity, and emotional pain and suffering and any other physical or mental injuries;

(f) An award of damages in an amount to be determined at trial, plus prejudgment interest, to compensate Wilson for harm to her professional and personal reputation and loss of career fulfillment;

(g) An award of damages for any and all other monetary and/or non-monetary losses suffered by Wilson in an amount to be determined at trial, plus prejudgment interest;

(h)  An award of punitive damages;

(i)  An award of costs that Wilson has incurred in this action, as well as Wilson's reasonable attorneys' fees to the fullest extent permitted by law; and

(j)  Awarding such other and further relief that this Court deems necessary and proper.

Respectfully submitted,

*/s/Chris P. Wido*
Chris Wido (0090441)
**THE SPITZ LAW FIRM, LLC**
25200 Chagrin Boulevard, Suite 200
Beachwood, Ohio 44122
Phone: (216) 291-4744
Fax:     (216) 291-5744
Email:

*Attorney for Plaintiff Michele Wilson*

## JURY DEMAND

Plaintiff Michele Wilson demands a trial by jury by the maximum number of jurors permitted.

*/s/Chris P. Wido*
Chris P. Wido (0090441)
**THE SPITZ LAW FIRM, LLC**